**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY a/s/o ARCO ENTERPRISES, INC., <br><br>  Plaintiffs, <br>  v. <br><br> BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC <br><br>  Defendant. | Civil Action No. 1:14-cv-00055-IMK |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF GARY A. DERAIN

COMES NOW, Plaintiff Westfield Insurance Company and hereby moves this Honorable Court to deny Defendant's Motion to Exclude the expert testimony of Gary A. Derain.

## I.    INTRODUCTION

A truck owned by Plaintiff's insured crashed because the tread and top four plies of the left steer tire separated and detached while the insured's driver was operating a large truck at the posted speed limit of seventy miles per hour on I-79 near Morgantown, West Virginia. Fortunately, the driver was not significantly injured.

Plaintiff has retained Gary A. Derian as an expert witness to offer opinion testimony on the cause of the tire separation and detachment, as well as the accident.   The Defendant has now moved to have Mr. Derain barred from testifying based on *Daubert* and its progeny.

Contrary to Defendant's argument, Mr. Derian is a well qualified expert and Professional Engineer who has spent decades designing, building, testing and analyzing tires.   Indeed he designed tires and investigated failures similar to the tire blowout here while employed by one of Defendant's chief competitors.

Moreover, Mr. Derian's method of examining the subject tire and his conclusions are supported by peer-reviewed articles.  In essence, Mr. Derian used a widely accepted method of examining the subject tire and this examination led him to conclude the tire separated and detached because of poor adhesion between the first ply and the tire carcass ply.  Moreover, his examination found a smooth surface where this separation occurred.   Peer-reviewed literature establishes that the plies in a properly bonded tire fuse into one continuous piece of rubber.  This means that where a separation occurs between two plies and there is a smooth surface at the point of separation, the two plies were never properly bonded.

Mr. Derian opinion reliable, relevant and in keeping with *Daubert;* therefore, Mr. Derian should not be excluded.

## II.    GARY DERIAN IS WELL QUALIFIED TO OFFER HIS STATED OPINIONS

Mr. Derian, a Professional Engineer, has spent the majority of his life working with, designing, building and analyzing tires.  Despite Mr. Derain's considerable experience and knowledge regarding tires – which includes designing tires and analyzing their failures for one of the Defendant's competitors – the Defendant argues that Mr. Derain is not qualified to opine on the cause of the tire blowout and subsequent accident in this case.  To be clear: Defendant's argument is wrong.

The Defendant seems to be advancing the position that, to qualify as an expert concerning tires, one must: 1) have worked in the tire industry within the last couple of years, 2) have been both a tire designer and a tire builder, 3) have taken with him or her confidential internal studies and data of his employer to support every one of his opinions, and 4) have had direct experience designing, building and manufacturing exactly the same tire that is at issue in the given case, or one virtually identical to it. (There is also an inference in Defendant's Motion

that a tire expert must be a detective and a diplomat.)  This is an absurd position that ignores Federal Rule of Evidence 702 and well established precedent. Neither case law nor the rules contain such a specific list of requirements for expert testimony in a tire case.

To testify as an expert, an individual must show that he or she is qualified based upon the combination of her knowledge, skill, experience, training and education. See, F.R.E. 702 ("a witness qualified as an expert by knowledge, skill, experience, training, or education, may [offer expert opinions related to that subject area]"); *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993); *see also, Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) (the Court should consider the "expert's full range of practical experience as well as academic or technical training"). Defendant's focus of what Mr. Derian is not, and its focus on the elements above such as the fact that Mr. Derian left the tire industry a number of years ago and that he cannot produce internal tire documents for every one of his specific opinions, is nothing but a deliberate effort to conceal from the Court what Mr. Derian is -an extremely well qualified expert in the area of tires, including the area of tire failure analysis, as well as vehicle handling issues following a tire failure.

A.    **Areas of Mr. Derian's Opinion Testimony at Issue**

As reflected in Mr. Derian's report, he conducted an extensive visual and tactile examination of the subject tire, collected data and information concerning his observations, considered alternative explanations which could explain the cause of the tire failure he observed, consulted authoritative materials concerning his observations, and ultimately rendered opinions concerning the cause of the tire failure and its effect on vehicle control in this case. *See* Exhibit "A", Mr. Derain's report.

**B.**     **Mr. Derian's Education, Employment and Experience with Tires Makes Him Qualified to Render Opinion Testimony in This Case**

As reflected in Mr. Derian's Curriculum Vitae and his Affidavit, *see* Exhibits "B" and "C" respectively, he has extensive education, training, knowledge and experience concerning all areas of tire manufacture, tire design, tire components, tire engineering, tire building, tire performance, and tire failure analysis. Rather than lay out the entirety of Mr. Derian's education, training and experience herein, Plaintiff provides the following overview of some of the key elements that render Mr. Derian qualified to render his opinion in this case:

- Mr. Derian is a Mechanical Engineer with a Bachelor of Science Degree from Case Western Reserve University. He is a licensed professional engineer in the State of Ohio, where he lives and where he maintains his office. He is also a member of the Society of Automotive Engineers. *See* paragraph 1 of Exhibit "C".

- Mr. Derian has testified/qualified as an expert in several recent trials involving tires, and he has testified on the subject in deposition numerous additional times. He has also testified in a variety of other subjects where he was able to employ his engineering background to offer opinions. *See* Exhibit "D" a table of Mr. Derian's recent testimony.

- 1974-1986: Mr. Derian was employed in a variety of capacities including as a tire engineer for the BF Goodrich Company. He was responsible for designing, building, and conducting failure analysis testing of a large variety of steel belted radial passenger tires, including high performance tires that are subjected to much greater stresses and strains than ordinary passenger tires such as was involved in this case. He did extensive work in studying how to avoid tire failures, including counter-measures

4

for tread separation failures (the failure mode at issue in this case). *See* paragraphs 5-13 of Exhibit "C."

- While at BF Goodrich, Mr. Derian was involved in tire ply pull testing to test the adhesion strength of tire plies. *See* paragraph 50 of Exhibit "C." In conducting such tests Mr. Derian and his colleagues would consider a tire to be poorly adhesed if tire plies separated at their original surfaces, as is the case in the instant case. *Id.*

- 1986-1988: Mr. Derian taught and consulted with a professional driving school, including training police, fire and ambulance drivers how to respond to tire failures. *See* Exhibit "B."

- 1987-1989: Mr. Derian was a Chief Engineer for Avanti Automotive Company, a manufacturer of motor vehicles, which included virtually all aspects of the design of the vehicles as well as compliance with government regulations related to motor vehicle related products. *See* Exhibit "B."

- 1989-2000: Mr. Derian was a Project Engineer and Consultant for Nordson Corp., for whom he designed and produced a variety of products and where he was charged with compliance with various governmental standards applicable to manufacturers. He also wrote manuals and warnings for consumers. *See* Exhibit "B."

- 990 through mid-2000's: Mr. Derian was a consultant for Dunlop Tire Co., including being the author of that company's tire fitment guide for all passenger cars and light trucks sold in the United States. *See* paragraph 15 of Exhibit "C."

- 1990 – 2013: During the time that he was also working as a consultant for Goodyear/Dunlop, and as a Project Engineer/Consultant for Nordson Corp., Mr. Derian also worked in the field of litigation consulting including offering expert

5

analysis/testimony, including in the fields of tire failure analysis, tire defect opinions, and accident reconstruction. He has been involved in more than 80 cases involving tire failure analysis. *See* Exhibit "B."

- Currently Mr. Derain is the owner of Derian Engineering, LLC., where he continues to conduct forensic expert services regarding tire failures. *See* Exhibit "B."

- It is also notable that Mr. Derian has authored several tire related patents. *See* Exhibit "B."

As it relates to his most central opinions in this case, which is a determination and explanation of what caused this tire to fail, it is difficult to imagine someone more qualified by professional experience.

## II.    Mr. Derian's Opinion is Reliable Because He Examined the Subject Tire in a Manner Accepted by Experts in the Field and Formed His Opinions Based Principles Articulated in Peer-Reviewed Literature

Based on a detailed visual and tactile examination of the subject tire and with the support of peer-reviewed literature, Mr. Derian reliable concluded that the tire manufactured by the Defendant failed because of poor adhesion between the first ply and the tire carcass. Put simply, the relatively smooth carcass ply at a specific portion of the subject tire where the first ply separated and detached evidences, to a reasonable degree of engineering certainty, that the tire was defectively manufactured. *See* paragraphs 44 and 55 of Exhibit "C."

### A.    The *Daubert* Standard

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Supreme Court settled a controversy regarding the continued viability of the *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923) "general acceptance" test for admission of scientific expert testimony in light of the congressional enactment of the Federal Rules of Evidence. The Court noted that

6

*Frye*'s rigid general acceptance requirement "would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony' '" and held that the *Frye* test should not be applied in federal trials. *Id*. at 588 (citations omitted). In holding that *Frye* was superceded by the Rules, the Court recognized that the Rules preserve the role of federal judges in evaluating the admissibility of expert scientific testimony. In that regard, the trial judge must ensure that scientific expert testimony is relevant and reliable. *Id*. at 589.

*Daubert* offered some "general observations" regarding considerations that may be appropriate for the trial court in considering the admissibility of expert scientific evidence. *Id*. at 593-594. The considerations set forth in *Daubert* are the testability of the scientific theory or technique; whether a theory or technique has been subjected to peer review and publication; whether a particular scientific technique has a known or potential rate of error and the existence of standards controlling application of the technique; and the degree of general acceptance of a particular theory or technique in the relevant scientific community. These considerations are neither mandatory nor all inclusive. *Id*. The Court emphasized that the trial court's inquiry was a flexible one and that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 594, 596. Chief Justice Rhenquist further emphasized these points in observing that Rule 702 does not impose on trial courts "either the obligation or the authority to become amateur scientists" in performing their role. *Id*. at 601-602 (Rehnquist, C.J., concurring and dissenting).

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Court confirmed that the trial court's role in assessing the reliability of "scientific" testimony as set forth in *Daubert* also

applied to testimony based on "technical" or "other specialized knowledge" and that, in considering the admissibility of such testimony, trial courts "may" consider the factors set forth in *Daubert*. *Id*. at 141-142. In so holding, the Court emphasized that the *Daubert* list of specific factors were not a definitive checklist, but rather were illustrative considerations which "neither necessarily nor exclusively appl[y] to all experts or in every case." *Id*. The Court agreed that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. at 150. In fact, the *Daubert* factors "do not all necessarily apply . . .in every instance in which the reliability of scientific testimony is challenged." *Id*. at 151. The Court again emphasized in *Kumho* that the process of assessing the reliability of expert testimony is a flexible one, which is in many regards case specific, and in which the trial court has "considerable leeway." *Kumho*, 526 U.S. at 150-152.

Expounding upon *Daubert* and *Kumho*, the Fourth Circuit has reminded trial courts to be mindful that Rule 702 was intended to liberalize admission of relevant expert evidence, *Westberry v. AB*, 178 F.3d 257, 261 (4th Cir. 1999) (finding expert medical causation opinion based on differential diagnosis sufficiently reliable), and that *Daubert*'s "general observations" are not "mandatory criteria." *Maryland Casualty Company v. Therm-O-Disc*, 137 F.3d 780, 785 (4th Cir. 1998) (rejecting contention that trial court erred in failing to explicitly consider the *Daubert* factors in allowing the testimony of expert in electrical engineering). Echoing *Daubert*, the Fourth Circuit further reminds that the proper focus is on the "principles and methodology" of the expert, "not on the conclusions reached." *Westberry*, 178 F.3d at 261. Moreover, the trial court need not determine that the proposed expert's testimony is "irrefutable or certainly correct" in order to be admissible. *Westberry* at 261. *See also Maryland Casualty Company* at 783

8

(plaintiffs need not demonstrate to the trial court that the assessments of their experts are correct, rather only that they are reliable).

The holdings of *Daubert* and *Kumho* are reflected in the December, 2000 amendments to Rule 702. In deciding whether to admit expert testimony the court must consider whether (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

**B.      The Defendant's Citation to Two Texas Cases is Not Persuasive**

Defendant cites two Texas cases in an attempt to support its argument that Mr. Derian's opinion is unreliable.  This argument is not persuasive.

In Goodyear Tire & Rubber Co. v. Rios, the Texas Appellate Court held an expert should have been excluded in a case where "the parties agree[d] that the issue is not whether the tire separated; instead, the issue is what caused the separation—a manufacturing defect or the wear and tear on the tire since its manufacture in 199.  Goodyear v Rios, 143 S.W.3d 107, 111 (Tex. App. 2004).   Underlying this dispute was the fact that the tire in question had at least four punctures in the belt package, only one of which had been repaired.  *Id.* at 110.

Defendant claims *Rios* is similar to the instance case because, among other things, the expert did not use a methodology that was generally accepted and did not support his causation analysis with "any relevant peer-reviewed scientific literature."  *See* page 17 of Defendant's Motion.  In actually, Mr. Derian's visual and tactile inspection of the tire is an acceptable manner of observing and testing a failed tire.  *See* paragraphs 48 & 54 of Exhibit "C."  Indeed, Defendant's own expert, Mr. Grant, advocates a visual and tactile inspection.  *See* paragraph 20

Exhibit "C."  Moreover, Mr. Derian's opinion that the relatively smooth carcass ply at the point of separation indicates a poor adhesion defect is supported by peer-reviewed literature that holds a properly bounded tire plies cannot separate without producing a rough tearing pattern at the point of separation. *See* paragraphs 44 & 47 of Exhibit "C."  (A portion of the tire separation at evidences a smooth surface indicating that it was not properly bonded.)   Finally, Mr. Derian's opinion on the applicability of peer-reviewed literature to this case is bolstered by pull testing that can be used test the adhesion strength of tire plies, which he conducted while at BF Goodrich. *See* paragraph 50 of Exhibit "C."

Defendant's citation to *Cooper Tire v. Mendez* is also distinguishable.   In a Texas Supreme Court explained its decision to disallow the expert in Mendez as follows:

> [I]n *Cooper Tire* [*v. Mendez*}, a manufacturing-defect case involving tread separation on a tire, we discounted as legally insufficient expert testimony offered to prove that the separation occurred because of wax contamination at the manufacturing plant. *Id.* We identified several deficiencies with the primary expert's testimony, including the novel nature of the theory that wax contamination is a cause of tread separation and the lack of general acceptance in the scientific community of that theory, *id.* at 803; the absence of evidence that the tire in question was even contaminated with wax, *id.;* the expert's reliance on a report that undermined his theory, *id.* at 804; and the lack of proof that wax would "cause lack of adhesion between the components of the tire after it is 'cooked' in the vulcanization process," *id.* at 805. Accordingly, we held that the expert's testimony amounted to no more than "a naked hypothesis untested and unconfirmed by the methods of science." *Id.*

*Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 877 (Tex. 2014), *reh'g denied (June 27, 2014).*

Here, Mr. Derian's opinion is supported his examination of the tire and by peer-reviewed literature.  *See* paragraphs 44, 47, 48, and 54 of Exhibit "C."

**C.     Mr. Derian's Method of Testing and Examining the Subject Tire Comport with Standard Practices of Those in the Field, Including Defendant's Expert**

Mr. Derian opinions are based upon facts and data. He spent significant time examining the failed left steer tire.  As part of investigation of the subject tire, Mr. Derian did a visual inspection of the tire and took various measurements.  *See* paragraph 20 of Exhibit "C."  He also examined portions of the tire under microscope, amplifying his view by the power of 10.  *See* paragraph 48 of Exhibit "C."    He used ample lighting applied at different angles to look for shadows which might reveal discontinuities. In addition to his visual observations, Mr. Derian also utilized the tactile inspection technique commonly used by forensic tire examiners. *See* paragraph 20 of Exhibit "C."  As part of the tactile examination, in which the examiner uses his hands to detect irregularities in the tire, Mr. Derian felt the surface of the tire and manually applied pressure to the tire in an effort to identify areas of separation. Mr. Derian documented his examination with photographs of the subject tire.

Despite the fact that a visual and tactile examination is also supported by Defendant's expert and peer-reviewed literature, *see* paragraphs 20 & 48 of Exhibit "C", Defendant claims Mr. Derian should have done more testing.   Defendant argues Mr. Derian should have used a microscope, scanning electron microscope or EDX analysis.  However, each of these techniques would over magnify the tire surface to the extent that an analysis of the separation point would be meaningless.  Again, analysis with a magnification to a power of ten is supported by the literature.  *See* paragraphs 48 of Exhibit "C."  Defendants also argue for the use of shearography or holography tests; however, these tests are useful only when a potential defect (i.e. separation) is hidden by the tread.  Here, the tread detached so this is not an issue.  Finally, Defendant argues for x-rays, which are good for identifying problems with the metal cords.  The issue here is of rubber to rubber bonding, and such a bond would not be seen by an x-ray.

To be clear, Mr. Derian's method of examination by augmented visual inspection and feel is warranted and supported by the literature.  In *The failure Analyst and Rubber Product Surfaces,* by Ronald W. Smith, which was relied upon by Mr. Derain, the author states that visual inspection of the torn rubber surfaces in a tire provide valuable information regarding how the tire failed.  Mr. Smith states that the use of microscopy with a power of 10, which is what Mr. Derian used, is useful in analyzing tear patterns in rubber surfaces to determine the cause of failure.  *See* paragraph 48 of Exhibit "C"

Moreover, Mr. Derian' s tire failure analysis methodology is precisely what was approved and discussed in *Kumho Tire Co., Ltd. v. Carmichael,*119 S.Ct. 1167, 1178 (1999)("Nor does anyone deny that, as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire. See Affidavit of H.R. Baumgardner 1-2, cited in Brief for National Academy of Forensic Engineers as *Amicus Curiae* 16 (Tire engineers rely on visual examination and process of elimination to analyze experimental test tires)"). Moreover, the very methodology which Mr. Derian utilized was employed by defendant's expert in this case.

**D.    Mr. Derian's Conclusions are Supported by Peer-Reviewed Literature and are Testable**

In order to bind tire plies together during the manufacturing process, Bridgestone, like all tire manufactures employed a process of heat and pressure that literally bonds the molecules in the separate plies together across the interface to form a continuous layer of rubber.  In cases like the one here, where one ply separates from another, the tire was not properly bonded in the manufacturing process.  This proposition is supported by peer-review articles and can be tested

by subjecting a tire to a ply pull test, such as Mr. Derian did while he worked for Defendant's competitor.

Based upon his visual and tactile inspections of the subject tire, Mr. Derain found evidence of poor adhesion between the belt edge cushion gum and the carcass ply. Poor adhesion would only occur during the manufacturing process. When the subject tire left the defendant's factory, it had this poor adhesion defect between the cushion gum for first belt ply and the tire carcass ply. The poor rubber to rubber bonding between the cushion gum for first belt ply and the tire carcass ply caused the adhesion defect. This adhesion defect was created during the manufacturing process. Photographs taken by Mr. Derian documented the poor adhesion observed on the subject tire. These photos show the original surface of the carcass ply skim stock which is evidence of poor adhesion. *See* paragraph 22 of Exhibit "C."

A tire is a rubber/wire composite structure that is manufactured from many layers of materials. The liner ply retains inflation air. The carcass plies withstand the force of the inflation pressure and shape the sides of the tire. The belt forms the foundation for the tread and sets the diameter of the tire. These various plies are squeezed together with high heat and pressure when the tire is cured in its mold. During the curing process, the rubber in the plies of the tire becomes vulcanized and the molecules interdiffuse across the interface as they intertwine and crosslink to form a continuous layer of rubber. *See* paragraph 23 of Exhibit "C."

In a well-bonded tire, these rubber layers become a single layer in which the original surfaces disappear. This bonding is essential to the integrity of a tire. Without the rubber, a tire would be merely a tangled mass of bits of wire. The rubber holds the layers of wire together, keeps the strands of wire parallel, and transfers the stresses from one layer of wire to another so the layers act as a structure. *See* paragraph 25 of Exhibit "C."

13

The various components of a tire are prepared in different parts of a tire plant.  The materials are coated with uncured rubber that is tacky to the touch like a pressure sensitive adhesive.  These materials are then transported to the tire assembly machine.  Because the tire components are tacky, they cannot be allowed to touch each other before being assembled into a tire.  To prevent this touching, the components are typically rolled up with a liner material or separated on trays.  This separation prevents the rubber pieces from sticking together until the tire is assembled.  It is important to keep the separated objects clean to prevent contamination of the tire components.  It is also important to manage the inventory of tire components to keep them fresh.  Old or contaminated tire components lose their tackiness and do not hold together well when the tire is assembled.  Any of these conditions will cause poor adhesion between the components and result in an internal separation in the tire during its service.  *See* paragraph 28 of Exhibit "C."

In a properly cured tire, it is very difficult to separate the various layers of steel belt plies along their original surfaces.  The layers must work together as a single unit, a rubber/wire composite structure, in order for the tire to perform as designed.  The layers of a tire, when cured, form a continuous stratum of rubber that gives a tire its strength.  These layers cannot be separated without tearing the rubber apart.  This tearing action leaves distinct marks on the rubber layers.  If the individual layers were old, contaminated, were never pressed together or otherwise had poor adhesion, they would separate along their original surface and leave no distinct tear marks.  This is the condition found between the carcass skim stock and the belt edge cushion gum in the detached area of the subject tire.  *See* paragraph 29 of Exhibit "C."

14

While the set of circumstances outlined above is supported by Mr. Derian's education, knowledge and experience in the field of tire failure analysis and design, it is also supported by peer-reviewed literature.

In Chapter 5 of *Rubber to Rubber Bonding*, the author describes how the molecules of rubber migrate and physically intertwine when the layers of rubber are brought into contact with each other.  This physical migration would therefore cause the original surface and any patterns in that surface to completely disappear once the rubber layers are pressed together then cured with heat and pressure.  *See* paragraph 47 of Exhibit "C."   In *The failure Analyst and Rubber Product Surfaces* by Ronald W. Smith, another article rely upon by Mr. Derian in forming my opinions in this matter, the author states the examiner of a failed tire should compare differing surface topography on the failed tire when analyzing a tire failure.  *See* paragraph 49 of Exhibit "C."

Following Smith's advice, Mr. Derian compared the normal tear patterns visible in the subject tire to the abnormal tear patterns.  He found the abnormal tear patterns are remarkable because of there are relatively smooth.  As Joseph's research establishes, properly bonded plies of a tire will not leave a smooth surface. Therefore, through this comparison of all the surfaces on the subject tire, in accordance with Smith, Mr. Derian determined the first tire ply and the carcass ply were never properly bonded.  *See* paragraph 49 of Exhibit "C."

Mr. Derian's argument that well bonded tire plies cannot separate without leaving a rough surface can be tested.  Indeed, Mr. Derian performed such testing while employed at BF Goodrich.  There he engaged in ply pull testing to test the <u>adhesion strength of tire plies.</u> *See*

15

paragraph 50 of Exhibit "C."   If the plies separated at their original surfaces, we would consider that to be poor adhesion.   *See* paragraph 50of Exhibit "C."

Finally, Mr. Derian was able to rule out all other potential causes of separation and detachment in the subject tire. *See*, paragraphs 31-43 of Exhibit "C."

**III.    Mr. Derian's Opinion that the Tire Separated because its Plies Were Not Significantly Bonded is Certainly Relevant.**

Contrary to Defendant's argument, Mr. Derian's opinion on the cause of the ply separation and detachment in the subject tire is in fact relevant to the facts at issue in this case. Mr. Derian's opinion is based on his education and experience as well as the principle articulated in *Rubber to Rubber Bonding* that molecules in tire plies will bond together, and that this bonding cannot be undone without leaving a rough surface.

Defendant also argues, without citation to law, that Plaintiff must prove the specific failure in Defendant's factory that led Defendant to manufacture a defective tire.  This is not the case.  Plaintiff has to prove, by a preponderance of the evidence, that the tire is defective.  It is not incumbent on Plaintiff to prove what caused the tire to be defective.  Here, Mr. Derian has offered a reliable and relevant opinion that the subject tire was indeed defective.

**IV.    Mr. Derian's Opinion that Tire Separation and Detachment Caused the Accident is Admissible**

Mr. Derian is a mechanical engineer with extensive experience in tire engineering, vehicle engineering and vehicle crash reconstruction.  See paragraph 1 of Exhibit "C."  While Mr. Derian has not performed a formal accident reconstruction in this case, he is offering the opinion that tire separation and detachment caused the subject accident based upon his accident reconstruction and driver instruction training, as well as based on his years of experience dealing

with the effect of tire failures on motor vehicles, his review of the police accident report, interview with the driver, the driver's deposition and photos of the accident scene.

In his deposition, Mr. Derian testified that a tire separation and detachment at the intersection of the first ply and the carcass ply would have caused the tire to experience sudden air loss.  *See* page 138, line 4-9 & 139, line 6-10 of Mr. Derian's deposition transcript, portions of which are attached thereto as Exhibit "E."   Mr. Derian testified that a loss of air pressure in the left steer tire would cause the truck to pull to the left and that the driver could not steer the truck to the right to keep from crashing.  *See* page 137, lines 10-14 of Exhibit "E."

**V.     Conclusion**

For the reasons discussed above, Defendant's Motion to Exclude Mr. Derian should be denied.

Respectfully submitted,

STEELE LAW OFFICES

Dated: 12/9/14

*Charles R. Steele*

CHARLES R. STEELE, ESQUIRE
360 Lee Avenue
Clarksburg, WV 26301
Telephone:  (304) 624-4004
Facsimile: (304) 624-9334
E-mail: crs@steelelawoffice.com

Damien Zillas, Esq. (Admitted *Pro Hac Vice*)
500 Office Center Drive, Suite 301
Fort Washington, PA 19034
Telephone: (215) 283-1177
Facsimile: (215) 283-1188
E-mail: zillasd@stutmanlaw.com

*Attorneys for Plaintiff, Westfield Insurance
Company a/s/o Arco Enterprises, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I, CHARLES R. STEELE, HEREBY CERTIFY that on this 9th day of December, 2014,

a true and correct copy of Plaintiff's Response to Defendant's Motion to Exclude the Testimony

of Gary A. Derian was served on the counsel listed below via the Court's ECF filing system:

Ronda L. Harvey
Bowles Rice LLP
600 Quarrier Street
Charleston, WV 25301

Jessie F. Reckart
Bowles Rice LLP
7000 Hampton Center
Morgantown, WV 26505

STEELE LAW OFFICES

*Charles R. Steele*

CHARLES R. STEELE, ESQUIRE
360 Lee Avenue
Clarksburg, WV 26301
Telephone:  (304) 624-4004
Facsimile: (304) 624-9334
E-mail: crs@steelelawoffice.com

Damien Zillas, Esq. (Admitted *Pro Hac Vice*)
500 Office Center Drive, Suite 301
Fort Washington, PA 19034
Telephone: (215) 283-1177
Facsimile: (215) 283-1188
E-mail: zillasd@stutmanlaw.com

*Attorneys for Plaintiff, Westfield Insurance*
*Company a/s/o Arco Enterprises, Inc.*